THE STATE OF KANSAS, *on the relation of John T. Little, Attorney General,* v. EDWARD L. MARTIN *et al.*

1. RAILROAD COMPANY—*Organization—Terminal Railroad.* Under the general law providing for the incorporation of railroad companies, a circular or terminal railroad may be projected and constructed, and a company organized for that purpose may exercise the power of eminent domain.

2. STATUTE—*Sort of Railroad—Public Use.* The statute contains no limitation as to the course or length of a projected railroad. It may be long or short, circular or longitudinal, providing it is built for a public use and within the contemplated purposes of the statute.

3. PLEADINGS—*Forfeiture of Charter.* A railroad company organized under the general law cannot shirk or avoid any duty which it owes to the public; and an allegation or claim that the company at some future time intends to neglect the performance of its full duty to the public is not a ground for forfeiture; nor can the question of whether the company intends in good faith to carry out the declared objects of its organization be inquired into in *quo warranto* proceedings.

## Original Proceeding in Quo Warranto.

THIS is an original proceeding in the nature of *quo warranto,* brought in the name of the state by the attorney general, questioning the right of the Union Terminal Railway Company and the other defendants to use and enjoy the powers, privileges and franchises of a railway corporation, and for an ouster from the exercise of such powers, privileges, and franchises. In his petition, the attorney general alleges that

"1. On December 29, 1891, the defendants, Edward L. Martin, Arthur E. Stilwell, Arthur A. Mosher, and James H. Pickering, of Kansas City, Mo., and Omar D. Hall, Wm. Thompson, and J. Jay Spencer, of Kansas City, Kas., associated themselves together with a view of filing a charter and forming a corporation under the laws of the state of Kansas, and on said day they caused to be filed in the office of the secretary of state of the state of Kansas an instrument intended as a charter, in which they named as directors for the first

year themselves, and also Edward P. Merwin, of New York city, and William S. Taylor, then of Philadelphia, Pa., but now of Kansas City, Mo., and the name of the proposed corporation was therein stated to be 'The Union Terminal Railroad Company,' with an authorized capital stock of $2,000,000, divided into shares of $100 each, and its declared purpose was as follows, to wit: 'This company is formed to acquire by purchase or lease, or to construct, maintain, and operate, a standard-gauge railroad for the transportation of persons and property, by the use of steam or other motive power, from a point on the north side of the Kansas river opposite the city of Argentine, in the county of Wyandotte, in the state of Kansas, in a northwesterly direction, by the most convenient and practicable route, to a point at or near the Missouri river; thence along and down the valley of the Missouri, and up the valley of the Kansas river, to the place of beginning; so as to substantially encircle the city of Kansas City, Kas., in said county of Wyandotte. Also, to acquire, by purchase or lease, or to construct, maintain and operate such branch or branches, or spur or spurs, as may be necessary for the business of said company, to enable it to make connection with the Consolidated Terminal Railway Company, now constructing a road in the s'ate of Missouri, at or near the state line between Missouri and Kansas, where said Consolidated Terminal railway intersects the state line, at or near the confluence of the Kansas and Missouri rivers; or with any other railroad or roads with which it may desire to connect. The main line of the company's road will be about 22 miles in length, and the main spur will run from a point at or near where the Consolidated Terminal railway intersects the state line, up the valley of the Missouri and Kansas, to a point where Ohio avenue (old Second street) extended would intersect the river; thence across the Kansas river, and by the shortest and most practicable route, to this company's main line.' The route of said proposed road was not defined otherwise than as above shown, and the places from and to which the road was intended to be run were not named, and they did not and do not appear, unless it be by the designation of a circle around a single city and a spur therefrom to the state line.

"2. Soon after the filing of said instrument, the defendant Edward L. Martin was, in some manner to the relator unknown, designated as president, and the said William S. Taylor in like manner as secretary, and they have ever since assumed to act as such.

"3. Although the declared purpose of the proposed corporation was to build a circular railroad around Kansas City, Kas., yet such was not and is not the real purpose of the defendants; but the said Edward L. Martin and William S. Taylor were and are president and secretary, respectively, of the Consolidated Terminal Railway Company, a Missouri corporation, and the said Edward L. Martin was and is president of the Kansas City Suburban Belt Railway Company, a Missouri corporation; both of said Missouri corporations being managed by the persons named as defendants as one interest, owning railroad tracks not exceeding 12 miles in length and partly encircling Kansas City, Mo., which is contiguous to Kansas City, Kas.; and said Missouri corporations desired and intended only to build a spur from the proposed end of their track at the state line, westerly a short distance in the direction of Argentine, Kas., about five miles from said starting point, to be used in connection with said tracks in Missouri, and for that purpose the persons named as defendants caused said instrument called a charter to be filed in the office of the secretary of state of the state of Kansas.

"4. The said Missouri corporations were organized for the purpose of doing a general switching and transfer business in car-load lots from one railroad to another, at Kansas City, Mo., and transferring cars from elevators and other industries to railroad companies for transportation, and in delivering cars for railroad companies received on their respective lines to such elevators and industries, and for the purpose of leasing certain parts of their tracks to railroad companies for terminal facilities, and said Missouri corporations are doing such business exclusively, all compensation for such switching business being paid by the several railroad companies employing them; and said Missouri corporations, although they have been transacting business for several years, have no route, nor tracks, nor stations, nor depots, nor rolling stock, nor facilities for transacting the usual and ordinary business of a railroad corporation as a common carrier in transporting passengers and property from place to place, nor for transporting property for all persons indifferently, in quantities great or small, at certain rates based upon tonnage and distance; and said Missouri corporations are not adapted nor intended for carrying on such usual and ordinary business of railroad corporations, but only for doing a switching business for railroad companies, at certain rates per car as a switching charge, and for leasing certain parts of their tracks to railroad companies

for terminal facilities; and the railroad track proposed by said so-called 'Union Terminal Railroad Company' was and is intended to form a part of said Missouri system for switching and terminals, and for no other purpose, and if such track shall be completed, it will be adapted to no other use or purpose.

"5. The said The Union Terminal Railroad Company is not a duly-chartered and organized railway corporation, and, although stock has been issued for the full amount named in said instrument called a charter, yet no share thereof has ever been legitimately issued nor paid for, but the same has been donated to certain persons and corporations expected to take first-mortgage bonds, which have already been issued to the amount of $2,000,000 on the proposed railroad, although such bonds have not been paid for; and the association of such persons named as defendants, and the said proposed corporation as a railway corporation, were and are unauthorized by law, and the organization of said persons as a railway corporation is fraudulent and void.

"6. Notwithstanding the foregoing facts, said persons named as defendants, without being legally incorporated, have acted within the county of Wyandotte and state of Kansas as a railway corporation, under the name of 'The Union Terminal Railroad Company' aforesaid, and under that name have usurped and assumed to and are exercising the power of eminent domain by the condemnation of real property in Wyandotte county for a right-of-way for a proposed railroad track, and by the crossing in Kansas of rights-of-way and tracks of railroad corporations, although said power has not been conferred by law upon said persons nor upon the said pretended railway corporation designated as 'The Union Terminal Railroad Company.'"

The prayer of the petition is, that the defendants be required to answer

"By what warrant they claim to have, use and enjoy the powers, liberties, privileges and franchises of a railway corporation, and especially the transcendent power of eminent domain, and that they be forever ousted from the exercise of such usurped powers, liberties, privileges, and franchises, and for such other relief as may be proper in the premises."

The defendants demurred to the petition, upon the ground that it did not state facts sufficient to constitute a cause of

action against them or either of them, and that its averments were not sufficient in law to require them to make answer thereto. The cause was submitted upon the petition and demurrer.

*John T. Little,* attorney general, for The State; *Frank Doster,* and *David Martin,* of counsel:

A general demurrer is interposed to plaintiff's petition, which raises only the question whether the petition does or does not state facts sufficient to constitute a cause of action. We contend as follows:

I. An enterprise such as that described in paragraphs one and four of the petition could not be incorporated as a railway company under the laws of this state.

II. The power of eminent domain could not be conferred upon such an enterprise.

III. The defendant company is not a "duly chartered and organized railway corporation," within the meaning of ¶ 1390, General Statutes of 1889, and therefore cannot exercise the power of eminent domain, nor the right given to railroad corporations to cross the tracks of each other.

IV. The organization of the defendant company as a corporation is a fraud in fact, as well as in law.

These points will be considered mainly in their order, but more or less blended with each other.

1. There is no express provision for the incorporation of circular railroads around cities, nor of spurs to connect one railroad with another. See §§ 5, 7, 81, (now ¶ 1390 of Gen. Stat. of 1889,) of the act concerning corporations.

That said § 7 does not include street railway corporations, has been expressly decided in *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.,* 31 Kas. 661, 671.

As a circle has neither beginning nor end, so the circular railroad proposed around Kansas City, Kas., can have neither initial point nor terminus. The phrase "places from and to which the road is intended to be run" implies extension from one town or neighborhood to another; not a circle around a

particular place, nor a spur connecting with such a circle around a place in another state. The right to make the appropriation must affirmatively appear, and when the *termini* of the road are not definitely shown in the charter, the proceeding to condemn is void. *A. & O. Rld. Co. v. Sullivant,* 5 Ohio St. 276–279.

2. It is alleged in the petition, among other things, that the corporation defendant, the Union Terminal Railroad Company, was and is intended to form a part of such Missouri system for switching and terminals, and for no other purpose, and if its track shall be completed it will be adapted to no other use or purpose. By the defendants' demurrer they admit the truth of these allegations, and by so doing the question arises, has such railroad company, organized for such purposes only, the right to invoke the power of eminent domain in its behalf?

Railroad companies are chartered and the power of eminent domain conferred upon them to enable them to do the completed work of freight and passenger transportation, not to do part of it, or part of the way, with the reserved right to call for a new charter or an additional grant to enable them to perform this duty more cheaply or conveniently to themselves. If such companies cannot do that, can a new company be chartered, with power to take lands, whose sole function is to *assist* in the business of railroading, by doing a specific portion, but not all the work which such other companies had been chartered to do in whole? No railroad company can be chartered or empowered to condemn lands to enable it to do the work of other railroads. The sanction of its existence and powers is found in the direct relations it sustains to the public, to natural persons, and not in the relation it sustains to other corporations—to artificial persons. Lewis, Em. Dom., § 165. The case of *Freight Co. v. Mayor of Memphis,* 4 Cold. 419, is fully in point. A most satisfactory and clearly expressed view of the qualities belonging to public agencies, which entitle them to demand the exercise of eminent domain

30—51 KAS.

is in the case of *Garner v. Martin*, 21 W. Va. 534. See, also, Mills, Em. Dom., § 14.

By the constitutions of many of the states, railroads are declared to be public highways; in others, to be common carriers, free to all persons for the transportation of themselves and their property. See constitutions of Pennsylvania, Illinois, Nebraska, West Virginia, Missouri, Arkansas, Texas, California, Colorado, Alabama, Louisiana, and Mississippi. See, also, 1 Beach, Railways, §§ 23, 776; *K. P. Rly. Co. v. Nichols*, 9 Kas. 235, 250; 2 Kent, Com. 598; *C. & A. Rld. Co. v. The People, ex rel.*, 67 Ill. 11; *Mikesell v. Durkee*, 34 Kas. 509.

In *Coster v. Tide Water Co.*, 18 N. J. Eq. 54, the New Jersey court of errors and appeals held, that where the use is public, the legislature is the sole judge of the necessity or expediency of exercising the power of eminent domain in the particular case; but it cannot evade the constitutional limitation of its power, or make a private use a public one simply by enacting that it is such. And if a state legislature cannot "make a private use a public one simply by enacting that it is such," then this court ought to deny to these gentlemen from Missouri the right to clothe a private local switching transfer company with all the powers and privileges of a "duly chartered and organized railway corporation" under the laws of Kansas, simply by their declaration that it is such.

3. We have here contended that the enterprise contemplated by the defendant company, as stated in the petition, is such that the right to exercise the power of eminent domain could not be conferred upon it; and we think the foregoing authorities, and others that might be cited, fully warrant our contention. But if the court shall differ with us in this respect, and think our claim too broad, then we are certainly justified by the authorities and the course of legislation in this state in saying that such a company is not a "duly chartered and organized railway corporation," within the meaning of our statutes conferring upon such corporations the right

to exercise the power of eminent domain and to cross the tracks of each other.

After a review of Kansas territorial and state legislation, counsel for plaintiff say: We now desire to call the attention of the court to the following additional authorities tending to establish our third proposition. Legislative acts should be construed with reference to existing conditions known to and within the common observation of all. See 1 Wood, Rly. Law, §§ 1, 5; Mills, Em. Dom., § 48; *Comm'rs of Shawnee County v. Beckwith*, 10 Kas. 603; *Atkinson v. M. & C. Rld. Co.*, 15 Ohio St. 21, 32, 33; *In re B. W. & N. Rly. Co.*, 72 N. Y. 245; *People v. Pittsburg Rld. Co.*, 53 Cal. 694; *Foltz's Appeal*, 56 Pa. St. 413; *McCandless's Appeal*, 70 id. 210; *Edgewood Rld. Co.'s Appeal*, 79 id. 257; *Currier v. M. & C. Rld. Co.*, 11 Ohio St. 228; *B. & N. Y. C. Rld. Co. v. Brainard*, 9 N. Y. 100, 108; *Salt Co. v. Brown*, 7 W. Va. 191, 199, 200; *L. &. P. Rld. Co. v. City Rly. Co.*, 2 Duvall, 175–178; *Electric Co. v. Simon*, 20 Ore. 36; *Cleveland v. Norton*, 6 Cush. 380; *N. F. & W. Rly. Co.'s Application*, 108 N. Y. 375; *C. & E. Ill. Rld. Co. v. Wiltse*, 116 Ill. 449; *Dock Co. v. Garrity*, 115 id. 155.

Counsel for the defendants suppose a line substantially encircling the state of Kansas, coming back to the place of beginning at Kansas City, of course, and thus magnify by about a hundred diameters the enterprise described in the charter of the defendant company, and then they propound the conundrum whether they could not exercise the power of eminent domain. We might minify their enterprise in the same ratio, and then ask them whether they could exercise the power of eminent domain for a merry-go-round.

No such thing as a circular railroad around a single town or city, for the purpose of switching cars to and from the several railroads entering such town or city, under special contracts as to compensation and furnishing terminal facilities for railroads, was either contemplated or imagined, when or before chapter 23 of the General Statutes of 1868 was enacted, and no such project seems to have entered the legislative mind

up to this day.   Whether the legislature *could* authorize the incorporation of such a company, and then confer upon it the power of eminent domain, we need not further inquire.   We do assert, however, that, under present legislation, such a corporation is not even authorized to have an existence, much less the right to exercise this sovereign power.

4.  The petition shows that the defendants claim franchises and are acting within this state as a railroad corporation without being legally incorporated as such, and that they are exercising powers not conferred by law and abusing such powers, all of which wrongs are specially denounced and made remediable by § 653 of the code of civil procedure. See *The State, ex rel., v. Comm'rs of Ford Co.*, 12 Kas. 441; *The State, ex rel., v. Insurance Co.*, 30 id. 585; *The State, ex rel., v. City of Topeka*, 30 id. 653; *The State, ex rel., v. City of Topeka*, 31 id. 452; *The State, ex rel., v. Mercantile Assoc'n*, 45 id. 351; *C. & N. W. Rly. Co. v. Dey*, 35 Fed. Rep. 866.

When the people of Kansas, through their representatives in the legislature and their governor, shall recognize "the necessity and importance of belt lines and terminal railroads," or either, and shall consider it necessary or proper that their promoters be allowed to incorporate them, and articles in due form are filed in the proper office and they are fully organized, it will then be time for the courts to recognize them as intangible but legal entities.   Under existing laws, however, they must be regarded as entirely nondescript.

*Trimble & Braley*, for defendants; *G. A. Vandeveer*, and *Rossington, Smith & Dallas*, of counsel:

There is, practically, but one question presented to the court, and that is, whether, under the charter filed in the office of the secretary of state, the defendant, the Union Terminal Railroad Company, is a railroad corporation, and as such, under the laws of Kansas, it has the right to exercise the power of eminent domain.

Counsel for the state say that the defendant's (the Union Terminal Railroad Company's) charter has no initial point

and has no terminus, and that it does not state the counties through which the road is to run.   In other words, that there can be no railroad corporation in Kansas unless it run from a designated point in one county to some other designated point in another county in the state; that it must be substantially a longitudinal road, and that a road which begins at a specified point and finally comes back to the same point, all within one county, is not a railroad corporation; that it is at most a street railway or tramway, and hence cannot exercise the power of eminent domain.   In support of this proposition, counsel for the state will, no doubt, rely largely, if not entirely, upon the following authorities: *Salt Co. v. Brown,* 7 W. Va. 191; *Mikesell v. Durkee,* 34 Kas. 509; *A. & O. Rld. Co. v. Sullivant,* 5 Ohio St. 276; *The People, ex rel., v. Pittsburg Rld. Co.,* 53 Cal. 694; *Stewart & Foltz's Appeal,* 56 Pa. St. 413; *Edgewood Rld. Co.'s Appeal,* 79 id. 257; *N. F. & W. Rly. Co.'s Application,* 108 N. Y. 375; *B. W. & N. Rly. Co.'s Application,* 72 id. 245; *Freight Co. v. Mayor of Memphis,* 4 Cold. (Tenn.) 419; *Electric Co. v. Simon,* 20 Ore. 60.

Counsel for defendants, having examined the foregoing cases, one by one, and called attention to ¶¶ 1155, 1156, 1207, and 1390, of the Gen. Stat. of 1889, continued as follows:

This court held, in *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.,* 31 Kas. 660, that the provisions of § 7 (1163) do not apply to a street railway company incorporated for the purpose of constructing and operating a horse-car railway in the streets of a single city, and we take it that the provisions of said § 7 are only applicable to such railway companies as intend to construct or operate a line of railroad operating between distant points and running through different counties of the state.

It certainly is not necessary that a railroad company, in order to have the right to exercise the power of eminent domain, must construct and build a railroad in more than one county; but, to construe the law as the state contends, this would be so, because § 7, above quoted, says that the charter

must state the counties through which it is intended to be run, and if a railroad company proposed, and so stated in its charter, to build a road from a point at or near the northwest corner of Wyandotte county; thence down the valley of the Missouri and up the valley of the Kaw to a point within the city of Argentine; thence in a westerly direction to a point within 100 feet of the west line of Wyandotte county; and thence north in said county parallel to said western line of said county to the northwest corner of said county, and thence east to the place of beginning, such a corporation, the state would contend, could not exercise the power of eminent domain.

We take it that the character of the way, whether it is public or private, and whether it may exercise the power of eminent domain, is determined by the question of the right to use it and not by the extent to which that right is exercised. If all the people have a right to use it, it is a public way, although the number who have occasion to use it be small. *Phillips v. Watson*, 63 Iowa, 28; Lewis, Em. Dom., § 161. This proposition is supported by many cases, and we might call attention to the various acts and provisions of the law with reference to the laying out of ordinary highways, the opening of streets, the condemation of sites for schoolhouses, etc.

The charter declares that the Union Terminal Railroad Company is organized for the purpose of operating a standard-gauge railroad for the transportation of persons and property. The allegation in the petition is at most but a declaration upon the part of the state that defendant company intends at some time in the future (if it be a violation) to violate its charter provisions or neglect to perform some of its duties to the public; but no mere intention or purpose in a corporation to violate its duty can constitute a cause of forfeiture. The design, clearly evinced, to do an unlawful act may justify interposition by a court of equity by a process of injunction, but it would be unjust, before the act was consummated, to visit the corporate body itself with the extreme penalty of civil death and

confiscation. *Commonwealth v. Pittsburg Rld. Co*, 58 Pa. St. 45. See, also, *Canal Co. v. Garrett*, 115 Ill. 155; *Lower v. C. B. & Q. Rld. Co.*, 59 Iowa, 563.

We here call attention to ¶ 1269, of the Gen. Stat. of 1889. See, also, *Petition of N. Y. L. & W. Rld. Co.*, 99 N. Y. 12, in which it was held: "The fact that a railroad corporation has leased its road to another corporation for the full period of its corporate life does not deprive it of the right to acquire title to lands for its corporate uses, nor is it material in this respect that the lessee is a foreign corporation." Also *Detrichs v. L. & N. W. Rld. Co.*, 13 Neb. 36; *C. & W. Ind. Rld. Co. v. Ill. Cent. Rld. Co.*, 113 Ill. 157.

Under these authorities, a railroad company could be legally chartered and exercise the power of eminent domain for the express purpose of building a railroad with branches and spurs and connecting with other railroads centering in the two Kansas Cities and leasing the same, as the state avers it is the intention to do, to other railroads for the use of such lessee for terminal facilities to bring in their trains into the city, and by means of which to effect the interchange of freight traffic with other railroads and to reach the packing houses, stock yards, granaries, warehouses, elevators, smelters, and the many and varied industries of said cites, and the use would be as much a public use, and the state would derive as much benefit therefrom, as the building a line entirely across the state. The court will take judicial notice of the geographical location of cities; and from the averments in the petition it is plain that there is a necessity for the building of such a road.

The charter of the Union Terminal Railroad Company complies with every requirement contained in § 7 of the statutes with reference to corporations. It states the kind of road intended to be constructed, the place from and to which the road is intended to be run, the county through which it is intended to be run, and the estimated length of the road.

There is nothing in the point that the line of railroad proposed to be built by the Union Terminal Railroad Company is a circle. Would this court hold that a railroad could not

be built, under the laws of Kansas, and that the company building it would not have the right to exercise the power of eminent domain, if the line described in the charter began at the city of Kansas City and substantially encircled the state of Kansas, coming back and ending at the same point? Such a construction of the law is altogether too narrow and too technical.

The opinion of the court was delivered by

JOHNSTON, J.: This proceeding challenges the corporate existence of the Union Terminal Railroad Company, and the right of the defendants to exercise the privileges, powers and franchises of a railroad corporation, and especially the power of eminent domain. The defendants organized, and obtained a charter, and are assuming to possess the privileges and powers of a legally-incorporated railroad company. It is contended that there is no express authority for the incorporation of circular or belt railroads, or spurs or short lines by which one railroad may be connected with another, and that, from the statements contained in the charter of the defendant company, it is apparent that it cannot be incorporated as a railroad company under the laws of this state upon which the power of eminent domain can be conferred. In § 4 of the act concerning private corporations, it is provided that they may be created by the voluntary association of five or more persons, for the purposes and in the manner mentioned in the following sections of the article: In § 5, the purposes for which corporations may be formed are stated, and, among others, provision is made for "the construction and maintenance of a railway and a telegraph line in connection therewith," and also for "the construction and maintenance of a street railway." In § 6, it is provided that "a charter must be prepared setting forth: First, the name of the corporation; second, the purposes for which it is formed; third, the place or places where its business is to be transacted; fourth, the term for which it is to exist; fifth, the number of its directors or trustees, and the names and residences of those

who are appointed for the first year; and, sixth, the amount
of its capital stock, if any, and the number of its shares into
which it is divided." In § 7, it is provided that the charter
of a road company shall state: "First, the kind of road in-
tended to be constructed; second, the places from and to which
the road is intended to be run; third, the counties through
which it is intended to be run; and, fourth, the estimated
length of the road." In § 47 some additional powers are con-
ferred, among which is the right to carry persons and property
on the railroad by the power of steam or of animals or of any
mechanical power, and to receive compensation therefor·
Section 234 of the act provides that any duly-chartered and
organized railway corporation may exercise the power of emi-
nent domain.

We have been referred to these provisions, and also those
of the charter, to show that the defendant company does not
possess the character and rights of an ordinary railroad cor-
poration. It is said that the charter contemplates the build-
ing of a circular railroad around Kansas City, Kas., which
can have neither initial point nor terminus, and that before a
company can exercise the privileges of a railroad corporation,
the termini must affirmatively appear in its charter. The
argument is that, as § 7 requires the charter to state the places
from and to which the road is intended to be run, the road
must be longitudinal rather than circular, extending from one
place or neighborhood to another, so as to have at least two
termini. It is true that there is no express provision for the
building of circular railroads, nor do we find any requiring
that only longitudinal lines shall be projected and constructed.
We find no limitations in the statute with reference to the di-
rection or course in which railroads shall be built, nor do we
think that any such limitation can be reasonably inferred from
the provisions of § 7. Chartered privileges and powers are
conferred upon railroad companies in order that they may
contribute to the conveniencies and necessities of the people
of the state, and if a circular or belt railroad will serve these

purposes, no reason is seen why it may not be so constructed. The statute does not provide that the road shall be built from a town or city in one county to a town or city in another county, nor does it require that the road shall be of a prescribed length. It simply provides that the places where it is intended that the road shall begin and end shall be stated in the charter. The same section provides that the counties through which the road is intended to be run shall be stated. But notwithstanding this provision, the counsel for the state disclaim the contention that a company may not be incorporated for the purpose of constructing and operating a railroad in a single county. This must be correct, as there is no limitation as to the length of the projected road. It may be long, or it may be short at the option of the promoters, provided it is built in good faith for a public use, and within the contemplated purposes of the statute. Looking at the provisions of the charter as set forth in the plaintiff's petition, we see that the company was organized to construct and operate a standard-gauge railroad for the transportation of persons and property by the use of steam or other motive power. The route of the proposed road is definitely described, and one portion of it is projected so as to substantially encircle the city of Kansas City, in the county of Wyandotte. Provision is also made for the further extension of the line so as to connect it with other railroads in Kansas and Missouri. The main line is estimated to be 22 miles long, and the plaintiff avers that that part which is proposed to be built from the Missouri state line westwardly to Argentine is about five miles long. The whole of the proposed road is within Wyandotte county; but if the termini of the road were within the limits of Kansas City, it would hardly be a valid objection to the charter. ( *Long Branch Comm'rs v. Railroad Co.*, 29 N. J. Eq. 566; *Railroad Co. v. Railroad Co.*, 32 id. 755.) The fact that the road when constructed will have a connection with other railroads does not impair the legality

2. Statute — sort of railroad — public use.

of the incorporation. Such connections are not only in the interest of the incorporators, but subserve the interest and convenience of the public. In fact, the legislature has given encouragement to the consolidation and connection of railroads (Gen. Stat. of 1889, ¶ 1268), and, where the convenience and accommodation of the public require. it, provision has been made to compel the construction of connections and switching facilities. (Gen. Stat. of 1889, ¶¶ 1352–1364.)

It is further contended, that because the road proposed to be built by the defendant company is mainly for terminal purposes, as stated in plaintiff's petition, its character is not so far public as to entitle it to exercise the power of eminent domain. This power cannot be exercised by a road designed alone for private enterprise, but only by such as are intended for public use and benefit. The purposes declared in the charter of the defendant railroad company meet every requirement of the statute in this respect. It is therein stated that the object for which the company was formed was to acquire, by purchase or lease, or to construct, maintain, and operate, a standard-gauge railroad for the transportation of persons and property. Nothing in the charter indicates a purpose to discriminate against anyone or to restrict the business of the corporation to anything less than is performed by the ordinary railroad company. It is alleged that the persons who organized this corporation were interested in Missouri corporations which were owning and operating railroads in Kansas City, Mo., which is contiguous to Kansas City, Kas. These corporations, it is stated, were organized for the purpose of doing a general switching and transfer business in car-load lots from one railroad to another, and to transfer cars from elevators and other industries to railroad companies, as well as to lease their road to railroad companies for terminal facilities. It is, then, averred that the Union Terminal Railroad Company is intended to form a part of this Missouri system for switching and terminals, and for no other purpose. The allegation that a railroad

1. Railroad company— organization —terminal railroad.

company organized under the general law in-
**3. Pleadings— forfeiture of charter.** · tends at some future time to shirk or avoid some
of its public duties does not warrant a forfeiture,
nor can the good faith of the purposes expressed in its char-
ter be made the subject of inquiry in this proceeding.   Even
the averments of the plaintiff do not show that the proposed
use of the road is not a public one.   Besides switching cars
from one part of the city to another, it is alleged that the
road is to be leased to other railroad companies for terminal
facilities.   Nothing is stated which shows that the companies
to which the road is intended to be leased will not afford
transportation to all who may apply or to all who under
ordinary circumstances would be entitled to such service.
The convenience and necessity of belt or terminal roads in
crowded and populous cities is well understood and has been
frequently demonstrated.   A single road which reaches a
union and other depots, as well as warehouses, elevators, and
other places in the city, is made to serve all the railway com-
panies operating to and from the city, when it would be im-
practicable and perhaps impossible for each of the companies
to secure an entrance and build its own line to the depots,
stations and storehouses in all parts of the city where rail-
road service is required.   By this means unnecessary roads
and expenses are avoided, and the facilities and convenience
of the public are greatly enlarged.   Every unnecessary mile
of railroad track adds to the cost of transportation; and as
the public which uses these roads is required to bear the bur-
den of this extra cost, it is clearly in the interest of the
public that a terminal road, which affords transportation to
all companies and people, should be constructed and main-
tained.   The fact that this proposed road is to unite at the
state line with a Missouri corporation gives no ground for
complaint.   The legislature has given express authority by
which railroad companies in this state may connect and con-
solidate with railroad companies of other states, where their
lines connect at the state line. (Gen. Stat. of 1889, ¶ 1268.)

Neither is the alleged purpose of the defendant company to

lease its line to other railroad companies a valid objection to
its exercise of the powers and privileges of a railroad corpora-
tion.   In the General Statutes of 1889, ¶ 1269, provision is
made that any railroad company of this state may sell or lease
the whole or any part of its railroad or branches, constructed
or to be constructed, to any other railroad company organized
under the laws of this or any other state or territory of the
United States. (*Railroad Co. v. Fletcher*, 35 Kas. 236; *Lower
v. Railroad Co.*, 59 Iowa, 563.)   The Atchison Union Depot
& Railroad Company has only a short terminal line, designed
and constructed for the purpose of furnishing the railroad
companies which enter the city with access to the union depot
and facilities for the interchange of traffic.   It was contended
that such a corporation was not a railroad company within the
meaning of the statute which might exercise the right of emi-
nent domain.   The validity of the corporation and its right
to exercise the power of eminent domain has been sustained.
(*Reisner v. Strong*, 24 Kas. 410.)   The declarations in the
charter of the defendant company and the allegations of
the petition sufficiently show that it was organized as a rail-
road company under the general law, and that it is designed
mainly to serve the public as a common carrier.   It is not
necessary at this time to determine whether such a company
operating through a city must accept passengers at every
street crossing and furnish the facilities which street rail-
roads are designed to furnish; neither need we determine
whether all of the company's line and branches must be
designed and used for the transportation of both passen-
gers and property.   The corporation being public, it cannot
avoid the performance of any duty which it owes to the pub-
lic.   If, from the allegations of the petition, it can be inferred
that the defendant company intends at some future time to
neglect the performance of its full duty to the public, it can-
not be held a sufficient ground for forfeiture.   The company,
having been invested with the powers, privileges and fran-
chises of a railroad corporation, is subject to all the duties and
liabilities of such corporation, and there is ample power to

compel the performance of any duty which it may neglect. (Gen. Stat. of 1889, ¶ 1217.) In *The State, ex rel., v. Kingan,* 51 Ind. 142, a proceeding in the nature of *quo warranto* was brought, challenging the right of the railroad company to exercise the privileges of a corporation, and especially the power to condemn and procure a right-of-way. It was alleged that the incorporators had organized a company for fraudulent purposes, and mainly to obtain a right-of-way for its road. It was alleged that the company did not intend to carry out some of the purposes of its organization, and it was held, that the mere intention to neglect a duty or prospective misuser would not warrant the maintenance of a *quo warranto* proceeding.

*The State, ex rel., v. Beck,* 81 Ind. 500, was a proceeding in *quo warranto,* where a question arose as to whether the railroad company had obtained the charter in good faith and with the intention of carrying out the rights and privileges granted to the corporation, but the court held that the question of prospective misuser, and whether the incorporators intended in good faith to carry out the objects of their organization, cannot be inquired into in *quo warranto* proceedings. The same question was before the supreme court of Pennsylvania, which held that

"No mere intention or purpose in a corporation to violate its duty can constitute a cause of forfeiture. . . . The design, clearly evinced, to do an unlawful act may justify the interposition of a court of equity by a process of injunction, but it would be unjust, before the act was consummated, to visit the corporate body itself with the extreme penalty of civil death and confiscation." (*Commonwealth v. Railroad Co.,* 58 Pa. St. 26.)

These authorities sufficiently show that nothing can be built upon the allegations that the company intends to ignore or neglect some of the duties which it owes to the public. It cannot, if it would, rid itself of any public duty, and if an attempt was made there is no lack of power in the state to compel performance.

The allegation with reference to the issue of an unnecessary and excessive amount of stock, as well as that full payment for the same had not been made, is not a proper subject of inquiry in this proceeding.

We conclude that the petition fails to state a cause of action, and that defendant's demurrer should be sustained. This will be the judgment of the court.

All the Justices concurring.